UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH C. BOULIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-cv-30103-KAR |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE
DECISION OF THE COMMISSIONER
(Dkt. Nos. 12 & 24)

ROBERTSON, U.S.M.J.

I.     INTRODUCTION

On June 9, 2015, plaintiff Joseph C. Boulia ("Plaintiff") filed a complaint pursuant to 42

U.S.C. § 405(g) against the Acting Commissioner of the Social Security Administration

("Commissioner"), appealing the denial of his claims for Social Security Disability Insurance

("SSDI") and Supplemental Security Income ("SSI").  Plaintiff asserts that the Commissioner's

decision denying him such benefits - memorialized in a November 21, 2013 decision by an

administrative law judge ("ALJ") - was not based on substantial evidence and was made in error.

The parties have filed cross-motions to resolve Plaintiff's claims, respectively seeking an order

for judgment on the pleadings (Dkt. No. 12) and an order affirming the Commissioner's decision

(Dkt. No. 24).

The parties have consented to this court's jurisdiction (Dkt. No. 14).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the following reasons, the court will deny Plaintiff's motion and allow the Commissioner's motion.

II.     PROCEDURAL BACKGROUND

On August 22, 2011, Plaintiff filed an application for SSDI, followed, on August 23, 2011, by an application for SSI (Administrative Record ("A.R.") at 207-225).  Both petitions alleged a December 31, 2007 onset of disability.  Plaintiff's applications were denied initially and on reconsideration (*id.* at 93-115, 118-145).   Following a September 26, 2013 hearing before an ALJ, at which Plaintiff appeared with a representative, and at which a medical expert and an impartial vocational expert testified (*id.* at 23, 25, 40-82), the ALJ found that Plaintiff was not disabled (*id.* at 14-35).  The Appeals Council denied Plaintiff's request for review (*id.* at 1-5).  The ALJ's decision thus became the final decision of the Commissioner.  This appeal followed.

III.    DISCUSSION

A. Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g).  The court's review is limited, however, "to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000) (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)).  The court reviews questions of law *de novo*, but it must defer to the ALJ's findings of fact if they are supported by substantial evidence.  42 U.S.C. § 405(g) (citing *Nguyen*, 172 F.3d at 35).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a

whole, could accept it as adequate to support [the Commissioner's] conclusion." *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).  In applying the substantial evidence standard, the court is mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id.* at 770.  The ALJ's findings of fact, however, "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen*, 172 F.3d at 35.  If the ALJ has made a legal or factual error, the court should reverse or remand such a decision to consider new material evidence or to apply the correct legal standard. *See Manso–Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); 42 U.S.C. § 405(g).

B. Entitlement to Benefits

To be found eligible for either disability benefits or supplemental security income, an applicant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Bourinot v. Colvin*, 95 F. Supp. 3d 161, 172 (D. Mass. 2015).  A claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or

whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under the statute.  *See* 20 C.F.R. § 404.1520.  The Commissioner must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id*. at § 404.1520(a)(4); *see also Goodermote v. Sec'y of Health & Human Servs*., 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the Commissioner determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  *See* 20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which is relied upon at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id*.  "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).  "Work-related mental activities generally . . . include the abilities to: understand, carry out, and remember instructions; use judgment in making work-

related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id.*, at *6.

The claimant has the burden of proof through step four of the analysis. At step five, the Commissioner has the burden of showing the existence of other jobs in the national economy that the claimant can perform notwithstanding medically determinable impairments. *See Goodermote*, 690 F.2d at 7.

C. The ALJ's decision

Plaintiff claimed to be disabled by chronic back pain and a mental health impairment. The ALJ engaged in the five-part analysis required by the regulations. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 31, 2007, his alleged onset date (A.R. at 17). At steps two and three, the ALJ found that Plaintiff had two severe impairments – lower back pain due to degenerative disc disease and a mood disorder - but concluded that these impairments, taken separately or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*id.*). Before proceeding to step four, the ALJ found that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a),[1] as long as he had the option to sit and stand at will, was not required to climb, stoop, bend, balance, twist, kneel or

---

[1] Regulations promulgated by the Commissioner define "sedentary work" as work that:

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

crawl more than occasionally, and could avoid heights, ladders, and hazards including dangerous machinery.  Having found that symptoms of pain and mood disorder would affect Plaintiff's ability to maintain persistence, concentration or pace, the ALJ further limited Plaintiff to work that involved simple, routine, and repetitive tasks requiring limited concentration, no independent decision making, minimal interaction and contact with the general public and co-workers, and no more than occasional changes in routine (*id.* at 18).

Plaintiff had previously worked as a finish carpenter and cabinet maker.  At step four, the ALJ found that Plaintiff was unable to perform any past relevant work (*id.* at 33).  At step five, considering Plaintiff's age, education, work experience, and RFC, and relying on the testimony of the vocational expert, the ALJ determined that Plaintiff could perform jobs found in significant numbers in the national economy, and, therefore, Plaintiff was not disabled (*id.* at 33-34).

### D. Summary of evidence

#### i.    Plaintiff's background and daily activities

At the hearing, Plaintiff testified that he was 41, married with children, and living with his family (*id*. at 44, 58).  He had completed tenth grade and obtained his GED through the Job Corps (*id*. at 44).  He worked as a finish carpenter and cabinet maker until he was laid off in December 2007 (A.R. at 44-45).  According to Plaintiff, he drove, "but not much at all" (*id*. at 59).  Although his wife worked part time and also had medical issues, she helped him with meals, the laundry, showering and "that sort of thing" (*id*. at 58-59).  He did not do any snow removal and his brother did the yard work around the house where he lived (*id*. at 59-60).  On a typical day, Plaintiff woke his daughter up and made sure she had something to eat before she went to school.  Sometimes he did a few things around the house, but mostly he was in bed all day.  He did not take walks or go outside much, and he and his wife had little social life (*id*. at

62).  He had no interest in activities outside the home, had recently lost at least 20 pounds, did

not sleep much at night, and took two or three naps a day, lasting anywhere from two to four

hours (*id*. at 64-65).

ii.     <u>Physical impairment and pain</u>

It is undisputed that Plaintiff has a history of chronic back pain and that objective

findings supported Plaintiff's claims of pain.  *See Irlanda Ortiz*, 956 F.2d at 769 (evidence of

ruptured disc constitutes objective evidence of medical impairment that can be expected to

produce pain).  The records show that Plaintiff had back surgery in 1999 and again in 2002 (A.R.

at 440, 516) with some post-operative improvement in his pain (e.g.*, id*. at 337).  In 2006, he was

in a motor vehicle accident that increased his back pain (*id*.).  During the relevant period (2008

through the hearing date), he treated with several primary care practitioners and a physiatrist and

was followed intermittently by R. Scott Cowan, M.D., the orthopedic surgeon who performed the

microdiscectomy on him in 2002.

In April 2008, Plaintiff met with Peter Drennan, D.O. for complaints of back pain.  He

rated the intensity of his pain at 5 plus out of 10 without medication and said his pain was well-

controlled with Tramadol (*id*. at 350).  In October of 2008, Plaintiff returned to Dr. Drennan,

reporting that work had aggravated his back pain, which was now radiating down his legs.  His

range of motion in the lumbar area was limited by pain, and a sitting left leg raise elicited pain.

He was advised to avoid lifting, twisting or bending, and stretching and abdominal strengthening

exercises were recommended.  He was given a prescription for Percocet, and an MRI was

scheduled (*id*. at 352).  The MRI showed several small disc herniations with some nerve root

compression (*id*. at 265-66).  By November of 2008 and through November of 2009, Tramadol

did not control his pain and he was prescribed Percocet and Oxycodone (*id.* at 353, 357).  In

November, Dr. Drennan's notes indicated "no lifting," and that Plaintiff needed to be out of work, but did not require a work note because he was unemployed.  Dr. Drennan recommended that Plaintiff follow up with Dr. Cowan, referred him for an appointment for pain management, and recommended that he also follow up with an arthritis center (*id.* at 362).  When Plaintiff returned to Dr. Drennan in May 2010, he had been a repeated no-show for appointments with a spinal pain management program and had not followed up with Dr. Cowan (*id*. at 363).

In August of 2010, Plaintiff began treating at Riverbend Medical Group.  His initial appointment was with Farhan Ibrahimi, M.D., who noted that Tramadol was helpful for control of Plaintiff's chronic back pain (*id*. at 289).  In February 2011, Plaintiff saw Charles Weston, M.D., at Riverbend.  Dr. Weston noted that Plaintiff had "long-standing low back pain" and "discomfort."  It did not appear that Plaintiff had been treated for the condition within the last few years, and there was no recent MRI.  Plaintiff had discontinued Tramadol and was taking Ibuprophen sporadically.  Plaintiff had been trying to work occasionally as a carpenter, which aggravated his pain (*id*. at 285).  Dr. Weston recommended a new MRI of Plaintiff's lumbar spine and prescribed Clinoril in place of the Ibuprofen Plaintiff had been taking (*id.* at 287).

A March 10, 2011 MRI showed multilevel bony and disc degeneration.  There was narrowing of the left L3, L4, and L5 neural foramina with possible compression of the left L3, L4, and L5 nerve roots (*id*. at 282).  Dr. Weston viewed the MRI as showing fairly significant nerve impingement on the lower left lumbar area.  He recommended that Plaintiff follow up with Dr. Cowan and prescribed Hydrocodone-acetaminophen for pain (*id*. at 283-84).  Dr. Cowen saw Plaintiff on May 4, 2011, and reviewed the recent MRI in connection with this appointment.  Plaintiff reported pain radiating from his left leg to his foot that was somewhat progressive.  The pain occurred primarily when he stood for any length of time, and was relieved by sitting and

recumbency.  According to Dr. Cowan, the MRI did not show significant nerve root impingement at the LS-L5 level.  In his view, "[t]here [wa]s possibly some [nerve root impingement] at the L4-L5 level from a lateral disc bulge" (*id*. at 305).  Dr. Cowen noted that the pain occurred primarily when Plaintiff stood for any length of time and was relieved by sitting and recumbency.  Plaintiff transitioned from sitting to standing fairly easily and walked with a slight limp.  The doctor recommended a transforaminal root block and follow up when the nerve block was completed (*id*.).

On May 20, 2011, following his appointment with Dr. Cowan, Plaintiff saw Karl Fuller, a physician's assistant at Pioneer Spine and Sports Physicians, P.C. (*id.* at 310-312) in advance of the nerve block.  Mr. Fuller's notes reflect that Plaintiff reported that, following his 2002 microdiscectomy, his severe pain decreased, but he was left with chronic intermittent pain in his lower back, sometimes extending down his left leg.  The pain, which had increased in the past year, was worse with standing and walking and improved with sitting and lying down (*id*. at 310).  Mr. Fuller noted mild discomfort when Plaintiff went from a sitting to a standing position, and a slight left antalgic gait.  Plaintiff's lumbar range of motion was 75% of normal due to left-sided lower back pain.  A straight leg raise on the left "reproduce[d] low back pain" (*id*. at 311).  Plaintiff agreed to the left L4-5 transforaminal epidural steroid injection, which was performed that day (*id*. at 312, 314).  During a June 6, 2011 follow-up appointment, Plaintiff reported that the injection had significantly improved the sharp pain in his thigh.  He still had a chronic ache in the region of his lower back and upper buttocks, which was worse with prolonged sitting, standing, and first thing in the morning, but he could tolerate the discomfort (*id*. at 308-309).  Plaintiff planned to follow up on an as-needed basis (*id.* at 309).

On May 3, 2012, Plaintiff returned to Riverbend Medical with complaints of on-going lower back pain.  He reported that his back pain had gotten significantly worse in the last four to five days and was now radiating down both of his legs (*id*. at 419).  He was not taking any pain medication.  He was given a prescription for Percocet.  Plaintiff reported that he was not able to work and was in the process of filling out paperwork for disability (*id.* at 419-20).  Plaintiff returned to Riverbend on May 24, 2012 for further evaluation of low back pain.  He described the pain as constant, moderate to severe in intensity, and radiating down both legs to the feet (*id*. at 416).  He had a decreased range of motion in his lumbar spine with a marked palpable spasm. His straight leg raise was negative, and his gait was normal without antalgia (*id*. at 417). Plaintiff did not wish to pursue physical therapy, chiropractic treatment, or interventional procedures because they had not helped in the past.  He received a prescription for Oxycodone (*id.* at 418).

### iii.   Mental health

In December 2011, Plaintiff was briefly hospitalized for chest pain.  During his hospitalization, he was referred for a psychiatric consultation (*id*. at 484).  Deborah Swan, an Advanced Practice Registered Nurse ("APRN"), assessed a mood disorder secondary to medical illness, and an adjustment disorder with mixed anxiety and depression (*id*. at 488).  During a follow-up appointment, Ms. Swan noted that Plaintiff "really seem[ed] to reject every suggestion that is made to him" (*id*.).  His diagnosis on discharge included "underlying anxiety disorder" and, at his request, he was given information about a psychologist and a psychiatrist (*id*. at 475-476).

In or around October 2012, Plaintiff began treatment, including counselling, at West Central Family and Counseling ("West Central").  The diagnostic assessment reflected that

Plaintiff was well-groomed, cooperative, had an intact memory and appropriate affect, and goal-directed thought processes.  He was anxious and his speech was rapid and pressured.  His current symptoms included a depressed mood, decreased energy, hopelessness, anxiety, organizational problems, and impaired social skills.  He reported using marijuana the night before his appointment and reported that the frequency with which he used it depended on his pain.  He was diagnosed with a mood disorder not otherwise specified, and cannabis abuse.  His highest GAF (Global Assessment of Functioning) score during the past year was assessed at 60 and his current GAF score was assessed at 50 (*id*. at 580-85).[2]  In February 2013, an APRN employed at West Central observed that Plaintiff's general appearance was within normal limits, he was well-groomed, and his gait was normal.  He was cooperative, his speech was normal, his thought process, judgment, insight, and memory were intact and he was fully oriented.  He was depressed, but Depakote was helping.  His chief complaint was that people "ticked him off" (*id*. at 574-577).  There were no significant changes when Plaintiff saw the same APRN on April 10, 2013 (*id*. at 569-70).

       iv.    Opinion evidence and RFC assessments

---

[2] "The GAF scale provides a 'rough estimate of an individual's psychological, social and occupational functioning.'" *Bourinot*, 95 F. Supp. 3d at 178 (quoting *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998)).  In the wake of the American Psychiatric Association's abandonment of the GAF scale, the Social Security Administration has said that, while it will continue to receive and consider GAF scores as evidence of an individual's ability to function, such "scores must have supporting evidence to be given significant weight."  *Id*. (citing *Kroh v. Colvin*, No. 13-CV-1533, 2014 WL 438675, at *17 (M.D. Pa. Sept. 4, 2014)).  A GAF score of 41-50 is indicative of "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious difficulties in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  American Psychiatric Institute, Diagnostic & Statistical Manual of Mental Disorders p. 34 (4th ed. 1994) ("DSM-IV"); *see also Lopez-Lopez v. Colvin*, Civil Action No. 14-10063-MPK, 2015 WL 7303529, at *1 n.4 (D. Mass. Sept. 19, 2015).  A GAF score of 51 to 60 is indicative of "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV, p. 34.

None of Plaintiff's treating health care providers completed a residual functional capacity questionnaire or offered an opinion about limitations on Plaintiff's ability to work on anything other than an episodic or temporary basis. The Disability Determination Services Division ("DDS") of the Massachusetts Rehabilitation Commission requested physical and mental health consultative examinations of Plaintiff. In each case, the resulting reports were in each case based on a single in-person appointment with Plaintiff.

a.   Physical consultative examination

Henry Dress, M.D. conducted a consultative examination of Plaintiff on April 13, 2012 (*id*. at 404-05). Dr. Dress's assessment was that Plaintiff suffered from degenerative disc disease. He noted that Plaintiff's forward flexion of his lumbar spine was "one-half of normal" and was limited by pain. Plaintiff's gait was within normal limits. Dr. Dress concluded that Plaintiff had "limitations as to repetitive bending, prolonged ambulation, or any heavy lifting" (*id*. at 405).

b.   Psychological consultative examination

Licensed Clinical Psychologist LaShanda Powell conducted a consultative psychological evaluation of Plaintiff on April 5, 2012 (*id*. at 397).[3] When Dr. Powell interviewed Plaintiff, he was unkempt and unshaven and his affect was dysphoric (depressed and anxious). He was alert and attentive and without signs of psychotic or delusional thinking or suicidal ideation (*id.* at 398). Plaintiff said that he had depression that lasted all day for up to three or four days accompanied by social withdrawal, apathy and irritability, as well as episodes of anxiety that were difficult to control (*id*. at 398-99). His overall cognitive ability fell within the average

---

[3] At intake, one of Plaintiff's allegations of impairment was that he was "mentally slow" (A.R. at 93, 397). Accordingly, Dr. Powell's consultative examination was focused in large part on testing Plaintiff's cognitive and intellectual functioning (*id.* at 399-402).

range, with significant variability in his intellectual profile (*id.* at 399-401).  Dr. Powell offered

the following diagnostic impressions:  bipolar disorder not otherwise specified (by history);

anxiety disorder not otherwise specified, and cannabis-related disorder not otherwise specified.

She assessed a GAF of 51 (*id.* at 402).

    c.  <u>DDS assessments</u>

    In April 2012, Ludmila Perel, M.D., opined that Plaintiff had a spine disorder that limited

his functional capacity.  Dr. Perel's RFC assessment, based on a review of Plaintiff's medical

records and the consultative examination, was that Plaintiff could occasionally lift up to 20

pounds and frequently lift up to 10 pounds, that he could stand or walk for about 6 hours, and sit

for about 6 hours, out of a normal 8-hour work day, had no limitations on his ability to push or

pull with his hands or feet, could climb stairs or ladders frequently, stoop, crouch, and crawl

occasionally, and had no limitations on his ability to balance or kneel (*id.* at 99-100).  On

reconsideration in August 2012, R. McFee, D.O., opined that Plaintiff had a spine disorder and

degenerative disc disease.  Dr. McFee's RFC assessment was that Plaintiff could occasionally lift

20 pounds and frequently lift 10 pounds, that he could stand or walk for 3 hours and sit for about

6 hours during a normal 8-hour workday, that he was limited in his ability to push or pull with

his lower extremities, that he could climb stairs frequently but could not climb ladders, that he

could stoop, kneel, crouch, crawl and balance occasionally, and that he should avoid

concentrated exposure to extreme cold and heat, vibration, fumes and odors, and dangerous

machinery and heights (*id*. at 128-29).

    As to mental health impairments, on initial review in April 2012, Joseph Whitehorn,

Ph.D., opined that the records supported diagnoses of affective disorder, anxiety disorder and

substance addiction disorder (*id.* at 97).  He concluded that Plaintiff would have moderate

difficulties in maintaining social functioning and concentration, persistence or pace, that the

records showed no repeated episodes of decompensation, and that there was insufficient

evidence for him to assess whether Plaintiff had restrictions on his activities of daily living (*id*. at

98).  On reconsideration, in September 2012, J. Lichtman, Ph.D., opined that the records

supported diagnoses of *non-severe* affective, anxiety, and learning disorders, as well as a non-

severe substance addiction disorder (id. at 140).  He concluded that there was insufficient

evidence to determine whether Plaintiff had any restrictions on his daily living activities,

difficulties in maintaining social functioning, or concentration, persistence or pace, or whether

Plaintiff had experienced any repeated episodes of decompensation of extended duration (*id.* at

140-41).

      E.     <u>Analysis</u>

      1.  <u>Substantial evidence supported the ALJ's conclusion that Plaintiff's chronic back pain did not disable him from all work</u>.

The ALJ concluded that Plaintiff's medically determinable impairments reasonably could

be expected to cause his alleged symptoms of back pain, but that Plaintiff's statements

concerning the intensity, persistence, and limiting effects of those symptoms were not entirely

credible (*id.* at 20).  *See, e.g., Pires v. Astrue*, 553 F. Supp. 2d 15, 22 (D. Mass. 2008) (if an ALJ

finds that claimant's impairments, as demonstrated by objective medical evidence, reasonably

can be expected to cause pain, an ALJ must evaluate whether the functionally limiting effect of

the pain is disabling).  Among the reasons the ALJ cited for declining to fully credit Plaintiff's

account of the disabling effect of his back pain was Plaintiff's hearing testimony that he was not

taking prescription medication for his pain (A.R. at 21).  Plaintiff contends that the ALJ treated

this as the dispositive factor in evaluating his credibility, and that any reliance on this factor was

error because Plaintiff's medical records showed that no physician had suggested that he take

pain medication on a long-term basis, and prescription pain medication was only partially successful in controlling his pain (Dkt. No. 13 at 12). This contention fails for at least two reasons. First, Plaintiff misstates the ALJ's reasons for not fully crediting his claims of disabling pain. Second, as the Commissioner contends, substantial evidence in the record supports the ALJ's credibility determination. *See Bourinot*, 95 F. Supp. 3d at 181 (issue for court is whether ALJ's credibility determination is supported by substantial record evidence).

When faced with subjective claims of pain, "an ALJ must inquire into six '*Avery* factors' at an individual's hearing and consider them in his or her decision." *Pires*, 553 F. Supp. 2d at 22 (citing *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986)). The so-called *Avery* factors are:

1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;

4. Treatment, other than medication, for relief of pain;

5. Functional restrictions; and

6. The claimant's daily activities.

*Avery*, 797 F.2d at 29. At the hearing, in compliance with *Avery*, Plaintiff was asked to describe his pain and any factors that precipitated it, whether he was taking pain medication or undergoing or considering any other treatment, what he was able to do on a daily basis, and what limitations his back pain caused (A.R. at 52-60).

*Avery* dictates that, in evaluating a subjective claim of pain, a hearing officer must consider the type, dosage, effectiveness and possible side effects of a claimant's medications. *See id.* Thus, the ALJ properly considered the type of medication Plaintiff was taking and treated his reliance on over-the-counter pain medication as a factor bearing on the credibility of his claim of disabling pain. *See Suarez-Linares v. Comm'r of Soc. Sec.*, 962 F. Supp. 2d 372, 379 (D.P.R. 2013) (ALJ properly relied on the "generally conservative nature" of plaintiff's pain medication regimen as a factor undermining plaintiff's claim of disabling pain); *see also Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004) (ALJ properly relied on assessment that plaintiff's treatment for alleged disability had been conservative).

Moreover, contrary to Plaintiff's contention, the ALJ did not treat Plaintiff's failure to take prescription pain medication as the dispositive factor in his assessment of Plaintiff's credibility. Rather, the ALJ relied primarily on inconsistencies between Plaintiff's claims in his disability and function reports, his hearing testimony, and his medical records (*id.* at 20). Among those inconsistencies, the ALJ noted that, while Plaintiff claimed to have been disabled since December 2007, he reported working after that date, suggesting that his daily activities were not as limited as he had said they were (*id.* at 20, 55-60), and receiving unemployment benefits, receipt of which required him to represent that he was willing, ready and able to perform work (*id.* at 21). *See Bourinot*, 95 F. Supp. 3d at 181 (ALJ properly relied on plaintiff's continuing efforts to find and engage in work after alleged onset date in determining that plaintiff's claims of disabling pain were not fully credible). The ALJ also noted that Plaintiff's statements about his use of marijuana, while perhaps not deliberately misleading, were inconsistent and evaluated Plaintiff's demeanor at the hearing as further evidence supporting the conclusion that Plaintiff was not a wholly reliable source of information (A.R. at 21). "'[T]he

16

credibility determination by the [Administrative Law Judge], who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings.'" *Guyton v. Apfel*, 20 F. Supp. 2d 156, 165 (D. Mass. 1998) (quoting *Frustaglia v. Sec. of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987)).  The ALJ adequately addressed each of the *Avery* factors in his decision, carefully summarizing Plaintiff's medical history.  He noted the reports of pain, precipitating and aggravating factors, and Plaintiff's course of treatment, including the type, dosage and effectiveness of medications.  *See Avery*, 797 F.2d at 29.  He accurately referenced the evidence of Plaintiff's daily activities (which was primarily in the form of Plaintiff's hearing testimony), and explained his reasons for not fully crediting the extreme limitations to which Plaintiff testified (A.R. at 20-21, 55-60).

There is substantial evidence in the record supporting the ALJ's conclusion that, while Plaintiff had significant functional limitations and was unable to perform his past work as a finish carpenter and cabinet maker, he was not disabled from all sedentary work (*id.* at 33). Overall, the record showed that Plaintiff consistently reported lower back pain that became severe on occasion.  As the ALJ noted in his summary of the records, at various times, Plaintiff reported that prescription medication was keeping the pain in pretty good control, or that it was tolerable, and there were periods of time when he did not seek treatment for the condition (*id.* at 22-24).  Treatment notes generally indicated that Plaintiff's overall appearance was normal or that he was not in acute distress (*id*. at 22-26).  He was most often able to get on and off an examination table, or in and out of a chair, without trouble, and his gait was either within normal limits or he exhibited a slight limp (*id.* at 22-25).  No doctor had suggested that he use a cane (*id.* at 55).

The only opinion evidence in the record supported the ALJ's conclusion that Plaintiff was not wholly disabled by his chronic back pain.  Dr. Dress, the consultative examiner who examined Plaintiff in April 2012, opined that Plaintiff's only functional limitations were as to repetitive bending, prolonged ambulation, and heavy lifting (*id*. at 404-405).  The ALJ appropriately gave "some weight" to Dr. Dress's opinions, *see J.B. ex rel. Barboza v. Astrue*, 738 F. Supp. 2d 260, 264 (D. Mass. 2010) (ALJ properly could rely on opinions of state agency consulting examiners), and explained that, to the extent he declined to give great weight to Dr. Dress's opinion about the extent of Plaintiff's functional limitations, it was to take into account medical records of treatment subsequent to Plaintiff's April 2012 appointment with Dr. Dress (A.R. at 27).  The ALJ also granted "some weight" to the RFCs prepared by the state medical examiners who reviewed Plaintiff's medical records in April and August 2012, again discounting to some extent their opinions about Plaintiff's functional limitations to take into account records of treatment subsequent to their assessments (*id*. at 32).  The administrative record did not include any RFC assessment or relevant opinion evidence about the extent of Plaintiff's functional limitations from any treating source.  Thus, there was no opinion evidence related to disability that would have been presumptively entitled to controlling weight under the treating physician rule.  *See Viveiros v. Astrue*, Civil Action No. 10-11405-JGD, 2012 WL 603578, at *8 (D. Mass. Feb. 23, 2012) (noting absence of treating provider opinion evidence addressing severity of plaintiff's mental health condition); *contrast, e.g., Nguyen,* 172 F.3d at 35 (remanding case where ALJ did not adequately justify rejection of uncontroverted medical opinion of incapacitation by severe pain from treating health care provider).  The ALJ was entitled to rely on the opinions of Drs. Dress, Perel and McFee to support his assessment of Plaintiff's physical limitations.  *See Viveiros*, 2012 WL 603578, at *8; *see also Coggan v. Barnhart*, 354 F. Supp. 2d

40, 54 (D. Mass. 2005) (ALJ should consider the findings of non-examining sources, such as state physicians, and may place significant weight on medical opinions from physicians appointed by the Commissioner).

While Plaintiff's claims of pain were supported by objective medical evidence, the record contained little, if anything, beyond Plaintiff's own statements to substantiate Plaintiff's subjective claim that the pain would disable him from performing sedentary work with the additional restrictions identified by the ALJ.  Uncontradicted evidence from Drs. Dress, Perel and McFee supported the ALJ's determination that Plaintiff was not disabled from all work. "[I]t is the responsibility of the ALJ, not this Court, to resolve conflicts in the evidence and draw reasonable inferences from the record." *Bourinot*, 95 F. Supp. 3d at 182.  Because the ALJ's credibility determination was supported by substantial evidence, it will be affirmed. *See id.*

2.  The ALJ properly rejected Dr. Golub's opinion evidence.

Plaintiff's second contention – that the ALJ erred when he rejected the opinion of psychologist Herbert Golub, Ph.D., an impartial medical examiner who testified that if Plaintiff's back pain was taken into account, Plaintiff "could equal [Appendix I listing] 12.04" – is unpersuasive on its face.  Dr. Golub appeared as an impartial medical examiner at the hearing (A.R. at 72-76, 89).  He testified that the record would support a diagnosis of mood disorder or bipolar disorder.  Asked whether, in Dr. Golub's opinion, Plaintiff met "the listing," Dr. Golub testified that Plaintiff would not meet the listing "unless we could take the chronic pain into account.  If we could take the chronic pain into account, we could equal 12.04" (*id.* at 76). Asked about the "B criteria," Dr. Golub testified that Plaintiff's mental health impairments would result in moderate restrictions in activities of daily living; moderate difficulties in maintaining social functioning; and marked difficulties maintaining constant pace.  Dr. Golub

saw no evidence of repeated episodes of decompensation of extended duration (*id.*).  *See* 20

C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (2015) ("Section 12.04").  To "meet the listing" in

Section 12.04, the regulations unambiguously provide that, in addition to meeting criteria set out

in subpart A of 12.04, which generally describe symptoms of a mood disorder, a claimant's

symptoms *also* must result in at least *two* of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

Section 12.04(B).[4]  As the ALJ apparently recognized, because Dr. Golub testified that, in his

opinion, Plaintiff did *not* meet at least two of the criteria in subpart B of Section 12.04, Plaintiff

did not meet the criteria for the impairment of mood disorder listed in Section 12.04 (A.R. at 32).

Dr. Golub's testimony that Plaintiff might qualify as disabled under Section 12.04 was, quite

simply, erroneous.  The ALJ also was entitled to take into account, as he did, that, as a

psychologist, Dr. Golub had no specialized knowledge in the area of spinal disorders (*id.*).  *See*

*Coggan*, 354 F. Supp. 2d at 56 (citing 24 C.F.R. § 404.1527(d), 416.927(d)) (in determining

weight to assign to expert medical opinion, ALJ should consider provider's speciality); *Guyton*,

20 F. Supp. 2d at 167 (same).

Plaintiff's claim that in rejecting Dr. Golub's opinion, the ALJ "dismiss[ed] a large body

of evidence . . . that support[ed] the conclusion that [Plaintiff] is under substantial mental health

---

[4] As an alternative to factors listed in Section 12.04(A) and (B), an individual may be found
disabled under this section when the requirements in Section 12.04(C) are satisfied.  *See* Section
12.04, first para.  Plaintiff does not claim that he met the requirements in Section 12.04(C), nor
would the record support such a claim.

impairments" ignores, again, shortcomings in the record in support of Plaintiff's claim of disability (Dkt. No. 13 at 13). As was true with respect to Plaintiff's claims of physical impairments, the administrative record contains no RFC questionnaire or assessment by any treating health care provider representing that Plaintiff was functionally limited by any mental health impairment. *See Viveiros*, 2012 WL 603578, at *8-9. At the hearing, Plaintiff testified that medication prescribed by his therapist helped "significantly" (A.R. at 48-51). Dr. Powell, who met with Plaintiff and performed extensive testing, did not opine that Plaintiff's mental impairments resulted in functional limitations that made him unable to work. She assessed his GAF score at 51 (*id*. at 397-402). Mental status checklists completed by West Central Family and Counseling in 2013 generally indicated intact and logical though processes, judgment, insight, and memory (*id*. at 575, 578, 584). Neither of the DDS assessments supported a finding of disability based on a mental health impairment. To the limited extent there was any contradictory evidence in the record, it was up to the ALJ to resolve any such conflicts. *See Bourinot*, 95 F. Supp. 3d at 182. Because the ALJ properly rejected Dr. Golub's opinion that Plaintiff met the listing in Section 12.04 and because substantial evidence supported the conclusion that Plaintiff was not completely disabled from working by any combination of physical and mental impairments, the ALJ's decision will be affirmed.

IV.   CONCLUSION

For the reasons stated, Defendant's Motion for Order Affirming the Commissioner's Decision (Dkt. No. 24) is ALLOWED, and Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 12) is DENIED. The case can now be closed.


IT IS SO ORDERED.                              /s/ Katherine A. Robertson
                                               KATHERINE A. ROBERTSON
Dated:  July 13, 2016                          United States Magistrate Judge